**JOHNSON ELECTRIC NORTH AMER-ICA INC. and Johnson Electric Industrial Manufactory, Ltd., Plaintiffs,**

v.

**MABUCHI MOTOR AMERICA CORP. and Mabuchi Motor Co., Ltd., Defendants.**

**Mabuchi Motor America Corp. and Mabuchi Motor Co., Ltd., Counterclaim–Plaintiffs,**

v.

**Johnson Electric North America Inc., Johnson Electric Industrial Manufactory, Ltd. and Trans–Hudson Motor Corporation, Counterclaim–Defendants.**

**No. 88 Civ. 7377(WCC).**

United States District Court, S.D. New York.

June 30, 2000.

As Amended July 11, 2000.

Moses & Singer LLP, New York City, for plaintiffs and counterclaim-defendants Johnson Electric North America Inc. and Johnson Electric Industrial Manufactory, Ltd., Stephen N. Weiss, Mark N. Parry, of counsel.

Baker & McKenzie, New York City, Robert B. Davidson, of counsel, Baker & McKenzie G.J.B.J., Minato-ku, Tokyo, John C. Kakinuki, of counsel, Kile McIntyre Harbin & Lee LLP, Washington, D.C., Bradford E. Kile, Richard A. Sterba, of counsel, for defendants and counterclaim-plaintiffs Mabuchi Motor America Corp. and Mabuchi Motor Co., Ltd.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs, Johnson Electric North America, Inc. ("JENA") and Johnson Electric Industrial Manufactory, Ltd. ("JEI") (collectively, "Johnson"), brought this action seeking a declaratory judgment that defendants' patents are invalid and have not been infringed by plaintiffs. Defendants, Mabuchi North America Corp. ("Mabuchi America") and Mabuchi Motor Co., Ltd. ("MMC") (collectively, "Mabuchi"), brought counterclaims for patent infringement. Presently before this Court is plaintiffs' motion *in limine* to exclude the proposed expert testimony of Dr. Jeffrey A. Dubin. For the reasons stated below, plaintiffs' motion is granted.

## BACKGROUND

JEI, a Hong Kong corporation, and JENA, a Connecticut corporation, are in the business of making small motors for a wide variety of products, including hair dryers, portable tools, and power door locks and mirrors in automobiles. MMC, a Japanese corporation, and Mabuchi America, a New York corporation, also produce small motors and are together one of Johnson's most important competitors. Mabuchi maintains a sizeable research and development department and spent approximately $17 million on research and development in 1997. *See Johnson Elec. North Am. Inc. v. Mabuchi Motor Am. Corp.*, 98 F.Supp.2d 480, 481 (S.D.N.Y. 2000) (WCC). Mabuchi asserts that, in comparison, Johnson's research and development efforts have been modest. (Mabuchi Am. Answer ¶ 97.)

### I. *The '933 Patent Litigation*

In 1985, Mabuchi discovered Johnson motor No. HC315G, and concluded that it infringed Mabuchi U.S.Patent No. 4,431,-933 ("the '933 patent"). Mabuchi sent one of Johnson's customers a letter informing the customer of the alleged infringement. In response, Johnson filed a lawsuit in the Southern District of New York alleging that Mabuchi was interfering with its contractual relations and seeking a declaration of the invalidity of the '933 patent. Mabuchi counterclaimed for patent infringement and filed a lawsuit against another one of Johnson's customers in the United States District Court for the District of Delaware. Mr. Roger Baines, Director of Research and Development for Johnson, admitted in his deposition that the structure shown in the drawings of Johnson's motor No. HC315G and that shown in the drawings of the '933 patent were substantially similar. (Baines Dep. at 91.)

In 1987, Johnson and Mabuchi resolved the '933 patent litigation in a written settlement agreement. (Defs.App., Ex. 9.) Article 04.00 of the Settlement Agreement governs the resolution of future disputes between the parties. That article provides that if either party believes that the other is infringing its patent rights, the aggrieved party should provide written no-

tice to the alleged infringer. (Settlement Agreement, Art. 04.01.) Further, the parties agreed to use "their best efforts to reach a mutually satisfactory settlement of the dispute" within 90 days of the written notice. (*Id.*, Art. 04.02.) If no resolution is reached within 90 days, the aggrieved party is entitled to commence litigation. (*Id.*, Art. 01.01 and 04.03.) In addition, the alleged infringer has the right to prevent the aggrieved party from contacting its customers if it "provided a means to undertake to assure the aggrieved party the legal and/or injunctive relief that would be available were it successful" in the infringement dispute. (*Id.*, Art. 04.03)

## II. *The '215 Patent Litigation*

Mabuchi's U.S.Patent No. 4,574,215 ("the '215 patent") issued on March 4, 1986. *See Johnson Elec.*, 98 F.Supp.2d at 482–83. The invention claimed in the '215 patent addressed a problem occurring in one of Mabuchi's motors that was used in automobile accessories, including power door locks and mirrors. Prior to the invention disclosed in the '215 patent, the motors contained a one-piece brushgear mechanism consisting of a terminal strip of rigid metal and a carbon brush attached at the end. The terminal strip's rigidity frequently resulted in its breakage.

Mabuchi directed the efforts of its research and development department to address this mechanical problem. Mr. Takachi Mabuchi, the president of MMC and Mabuchi America, personally participated in the design process and developed the invention claimed in the '215 patent.

The '215 patent teaches the use of a two-piece brushgear composed of a terminal strip and a separate commutator strip upon which the carbon brush is mounted. The terminal and commutator contactor strips are joined together by means of lateral projections on the terminal strip which are bent and crimped onto the edges of the commutator strip. The brushgear is L-shaped at the joint, and fits into a corresponding L-shaped slot in the brush holder on the motor case. When the brushgear is mounted in the brush holder, the terminal strip projects laterally through the motor case.

On or about March 18, 1983, Johnson learned of the existence of Mabuchi's motor with the two-piece brushgear from JEI's distributor and agent D. Rögelein GmbH, a German corporation. Dieter Rögelein, Rögelein's employee, sent a letter dated March 17, 1983 via facsimile to Patrick Wang, JEI's officer, director and employee, which provided information about the Mabuchi motor and stated that Mabuchi "has taken the chance to get a good reference in the automotive market ..." and Johnson "would like to kick them out as soon as possible." (Defs.Am. Answer ¶ 106.)

Along with the letter, Rögelein sent one of the Mabuchi motors to Johnson in Hong Kong and requested that Johnson manufacture a comparable motor. *See Johnson Elec.*, at 482–83. David Lam, a Johnson employee, was assigned the task of completing the design. In November 1984, Patrick Wang directed Lam to abandon his unsuccessful design efforts and simply copy the Mabuchi two-piece design. *See id.* Lam made a copy of the Mabuchi motor sometime in November 1984. *See id.*

In late 1986, Johnson altered its original brush gear structure which it had copied from Mabuchi. Mabuchi alleges that the second design included only minor revisions. (Defs.Am. Answer ¶ 109.)

Mabuchi filed an application for a United States patent on the two-piece structure in August 1983, and the '215 patent was granted thereon in March 1986. Roger Baines, Johnson's Director of Research and Development, testified that he became aware of the '215 patent at about the time of its issuance. (Baines Dep. at 151–52.)

It was not until July 15, 1988 that Mabuchi sent a letter to Johnson charging infringement of the '215 patent. Johnson then commenced the instant lawsuit in the

Southern District of New York, and obtained an *ex parte* order to show cause why Mabuchi should not be enjoined from contacting Johnson's customers. Judge Sprizzo denied Johnson's application for a preliminary injunction. (Defs.App., Ex. 11.) However, Mabuchi has not sued any of Johnson's customers for the use, sale, or manufacture of the Johnson motor that copied the Mabuchi '215 patent design.

Although the '215 patent issued in 1986, Judge Sprizzo, upon Johnson's motion, ruled that no direct damages could be awarded for infringement of the '215 patent prior to July 15, 1988 because Mabuchi failed to comply with the patent marking statute, 35 U.S.C. § 287, and gave no notice of the alleged infringement until that date. (*See* Order of Sprizzo, J., July 7, 1994.) Although Judge Sprizzo certified the order granting Johnson's motion for immediate appeal pursuant to 28 U.S.C. § 1292(b), the Court of Appeals for the Federal Circuit denied leave to appeal. *See Johnson Elec. North Am., et al. v. Mabuchi Motor Am. Corp., et al.*, 1997 WL 173208, at * 1, Misc. Docket No. 405, 1997 U.S.App. LEXIS 7687, at *1–2 (Fed.Cir. March 20, 1997).

### III. *Liability for Use Infringement by Johnson's Customers*

Dr. Dubin's estimation of Mabuchi's damages relies, in part, on the assumed liability of Johnson for the use infringement by Johnson's customers. Mabuchi asserts, on the basis of Article 04.03 of the Settlement Agreement that resulted from the '915 patent litigation, that Johnson assumed liability for use infringement by its customers.

The parties disagree as to the meaning of Article 04.03 of the Settlement Agreement. Mabuchi asserts that during the '915 patent litigation, Johnson demanded Article 04.03 "as a means of limiting [ ] notice of infringement and independent litigation activity to the principals as opposed to Johnson customers." (Kakinuki Counter–Decl. ¶ 3.) Further, Mabuchi argues that Article 04.03 "states in essence that if Johnson agrees to be liable for all of the damages of Johnson's direct and ultimate customers," Mabuchi will not notify or sue these customers. (*Id.*)

When Johnson moved at the commencement of this litigation in 1988 for a preliminary injunction preventing Mabuchi from suing Johnson's customers, Mabuchi argued that it "was no longer precluded under the 1987 Settlement Agreement from notifying or suing Johnson's customers." (*Id.* at ¶ 5.) Judge Sprizzo agreed and denied Johnson's motion. (Defs.App., Ex. 11.) However, Mabuchi argues that although it is permitted to notify or sue Johnson's customers directly, it is not compelled to do so. (Kakinuki Counter–Decl. ¶ 5.) If Mabuchi does not sue Johnson's customers directly, Mabuchi argues, Johnson has agreed to be liable for all of its direct or ultimate customers' use infringement in the United States. (*Id.* at ¶ 6.)

In support of its position, Mabuchi points to the testimony of Richard Wang, Johnson's president and chairman, during the preliminary injunction hearing before Judge Sprizzo. According to Wang's testimony, Wang understood Article 04.03 to mean that Johnson was granting consent to jurisdiction in the event of litigation. (Prelim.Inj. Hearing Tr. at 19.) In his affidavit, Wang further testified:

> Finally, the settlement agreement requires us to assure Mabuchi the means to collect the reasonable royalty it has demanded, and to designate an entity that Mabuchi can sue, should it be necessary, to recover that reasonable royalty. We have designated the Johnson Trans–Hudson Motor Corporation, a New York corporation, as an entity to be sued to recover such reasonable royalty, should Mabuchi prevail in any of these jurisdictions, and, further, state that any judgment against this company is secured by the combined assets of Johnson and JENA.

(R. Wang Aff. ¶ 14.)

Johnson argues that although it offered to assume liability for its customers' in-

fringement if Mabuchi agreed not to contact Johnson's customers, Mabuchi rejected this offer. (Weiss Reply Aff. ¶¶ 2–3.) Johnson thereupon sought a preliminary injunction to prevent Mabuchi from contacting or suing its customers, but Judge Sprizzo denied the motion. Therefore, Johnson argues, it has not assumed liability for its customers' use infringement.

In opposition to Johnson's motion *in limine* to exclude Dubin's expert testimony, Mabuchi argues that Dubin's testimony is necessary to prove damages because Johnson resisted discovery of its customers. (Defs.Mem. at 9–10.) Johnson counters that during discovery it "provided Mabuchi with invoices for all of its customers who purchased the allegedly infringing motors." (Weiss Reply Aff. ¶ 7.) Mabuchi obtained letters rogatory in order to take the deposition of D. Rögelein GmbH, Johnson's customer in Germany, but never filed or served the letters rogatory. (*Id.* at ¶ 9.) Instead of pursuing formal discovery with Johnson's customers, Mabuchi, in letters to the disclosed customers, requested voluntary disclosure. (*Id.* at ¶ 11, Ex. C.) At least one customer provided Mabuchi with copies of the documents requested. (*Id.* at ¶¶ 13–14, Exs. D, E.) Therefore, Johnson argues, Dubin's testimony is unnecessary because Mabuchi could have obtained from Johnson's customers the relevant information to prove damages, but chose not to.

Johnson's potential liability for its customers' use infringement is particularly relevant because Johnson sold only 9,600 allegedly infringing motors, valued at a total of $6,624, in the United States between April 1986 and June 1988. (Dubin Dep. of 6/8/99 at 345–46.) Although there is some dispute as to the number of sales in the United States from July 15, 1988, when Mabuchi complied with the patent marking statute, through March 1989,[1] when Johnson produced a non-infringing substitute micro-motor, Dubin's data show that there were no United States sales by

Johnson during that time period. (*Id.* at 346.) Therefore, as discussed below, in proving damages Dubin relies almost entirely on Johnson's sales outside of the United States of motors that were incorporated into products that were imported into and ultimately used in the United States. However, because we find that Dubin's proffered testimony as to damages is inadmissible on other grounds, we need not reach the question of whether Mabuchi is entitled to damages based on use infringement in the United States.

## IV. *Dr. Dubin's Qualifications*

Dr. Jeffrey A. Dubin is a co-founder and partner of the Pacific Economics Group. (Defs.App., Ex. 19.) He is also a tenured associate professor of Economics at the California Institute of Technology. (*Id.*) In 1978 he received a A.B. in Economics with highest honors and great distinction from the University of California, Berkeley, and in 1982 he received a Ph.D. in Economics from the Massachusetts Institute of Technology. (*Id.*) Dr. Dubin's current research focuses on microeconomic modeling with particular emphasis on discrete choice econometrics. (*Id.*) Dr. Dubin has significant experience in developing econometric models for use in patent and other litigation. (*Id.*) Plaintiffs do not dispute Dubin's qualifications.

## V. *Dr. Dubin's Report*

In the absence of direct evidence of damages arising from the alleged infringement, Dr. Dubin has prepared a detailed economic analysis of the worldwide market for micro-motors. Based upon that analysis, Dubin has estimated how many of Johnson's allegedly infringing micro-motors were used within the United States, *see* 35 U.S.C. § 271, and computed Mabuchi's resulting damages.

In his computations, Dubin assumed that by March 1989 Johnson had designed

---

1. Mabuchi has asserted that the sale of 9,600 motors occurred after July 15, 1988 and that

Johnson made an additional shipment of 400 motors after that date as well.

and manufactured a non-infringing substitute micro-motor. (Dubin Rept. at 2.) However, as discussed hereinafter, he did not cut off his computation of damages as of that date, but assumed that if Johnson had not entered the market until that time, it would have taken up to five years for Johnson's sales to reach their ultimate level and that during that build-up period Mabuchi would have made all the sales that Johnson could not.

Dubin attempts to evaluate what Mabuchi would have done with regard to the pricing of the micro-motors in the absence of Johnson's alleged infringement. (*Id.* at 4.) As a patent holder, Mabuchi has the right to exclude others from making, using or selling in the United States the patented micro-motor during the patent term. With such exclusivity, Mabuchi would have been able to set prices for the micro-motors without concern for competition. (*Id.* at *ii.*) However, with or without competition, the demand for micro-motors constrains the producer's pricing behavior. (*Id.* at 4.) Therefore, Dubin had to construct a model reflecting the demand for micro-motors in order to determine what Mabuchi would have done, but for Johnson's alleged infringement.

Dr. Dubin's report first explains that the demand for micro-motors is "derived demand." (*Id.* at *i.*) Derived demand means that "consumer demand for the products which contain these micro-motors will drive the demand for the micro-motors." (*Id.* at *i–ii.*) There are two types of micro-motors at issue here: the 100 series motors, which are typically used in small household appliances, and the 200 series motors, which are typically used in automobiles.

Dubin constructed the demand function for the 100 and 200 series micro-motors using historical sales data to estimate the quantities of a particular good customers will purchase at various prices. Dubin's historical sales data were derived from documents provided by Johnson and Mabuchi, from public sources such as Ward's

Automotive Yearbooks, and international trade statistics of imports and exports of small household appliances. (*Id.* at 16.) Using these sources, Dubin estimated the number of 200 series micro-motors used in cars and the number of 100 series micro-motors used in hair dryers, electric toothbrushes, juicers, and electric trains/cars shipped into the United States. (*Id.* at 23, 25.) In order to explain the worldwide demand for 100 and 200 series micro-motors, Dubin relied upon three main factors:

(1) demand for relevant automobile and household appliances market;

(2) the inflation-adjusted (real) micro-motor price; and

(3) a time trend to control for general trends in demand not accounted for in the other factors.

(*Id.* at 20, Ex. 15.)

The prices for both the 100 and 200 series micro-motors declined over time. (*Id.* at 27, Exs. 24, 25.) Johnson's prices worldwide for the 100 series are lower than Mabuchi's by 15–20%. (*Id.* at 26, Ex. 24.) Johnson's prices for the 200 series were lower than Mabuchi's for a time, after which the prices of the two companies were similar. (*Id.* at 27, Ex. 25.)

An important part of Dubin's analysis involved ascertaining the "demand elasticity" of the micro-motors. "Demand elasticity measures whether demand for a particular product is sensitive to price changes." (*Id.* at *iii.*) If a product is "price elastic," small changes in price will result in relatively large changes in the quantity demanded. If a product is "price inelastic," the quantity demanded will not change much as the price is increased or decreased. (*Id.*) Because a monopolist can increase the price of a price inelastic product without having a great effect on the demand for the product, "[i]t is extremely profitable for a monopolist to sell a product with an inelastic demand curve." (*Id.* at *iv.*)

From his econometric analysis, Dubin concluded that demand for the 100 series

micro-motors, those used in household appliances, is "very inelastic," while the demand for the 200 series micro-motors, those used in automobiles, is "completely inelastic." (*Id.*) Dubin explains that it is logical that the demand for the 200 series is more inelastic because a micro-motor used in an automobile door lock accounts for a much smaller portion of the cost of the automobile than a micro-motor for a hair dryer. Therefore, Dubin reasons, the price of 200 series motors could be raised significantly without affecting the demand for cars or the derived demand for micromotors used therein.

Dubin's derived demand curve shows that between 1985 and 1990 prices for the 100 series micro-motors fell by approximately one-third and production rose from 400,000 micro-motors per month to 900,000 per month. (*Id.* at 28, Ex. 29.) Dubin asserts that his derived demand analysis shows that some of this quantity increase is due to lower prices, but "the remaining quantity increase is due to a shift in the demand schedule as the world goods production utilizing that 100 series micro-motors increased." (*Id.* at 28.) The derived demand curve for the 200 series shows a price decline between 1985 and 1990 and a substantial quantity increase from 550,000 units per month to 1.8 million per month. (*Id.* at 29, Ex. 30.) However, Dubin concludes that, because demand for the 200 series micro-motors is completely inelastic, the increase in sales is not attributable to the decrease in price, but simply to the increase in the number of cars produced. (*Id.* at 28–29.)

The conclusions reached in Dubin's demand analysis were that: "1) the use of 100 and 200 series motors used in automobiles and household appliances caused substantial shifts in the demand curve; (2) the demand for 100 and 200 series motors is very inelastic: changes in price resulted in movements along the demand curve with only small changes in quantities." (*Id.*, Ex. 31.) From these findings Dubin concludes that Mabuchi could and would have

raised its prices but for Johnson's entry into the market. (*Id.* at 30.) In addition, Dubin concludes that fewer 100 series micro-motors would have been sold. (*Id.*) However, despite reduced sales of 100 series micro-motors, Mabuchi's revenues and profits would have increased because of increased prices. (*Id.*)

In order to ascertain the effect of Johnson's alleged illegal entry into the 100 and 200 series micro-motor market, Dubin compared Mabuchi's pricing behavior in Japan, a market that Johnson did not enter, with its pricing behavior in foreign markets, where Mabuchi was competing with Johnson. To do so, Dubin considered the following factors:

(1) ratio of prices of 100 and 200 series motors sold in Hong Kong, Taiwan, Germany, France, and the United States, to the price of 100 and 200 series motors sold in Japan;

(2) exchange rates between the Japanese yen and the currencies of Hong Kong, Taiwan, Germany, France and the United States;

(3) relative levels of inflation in Japan, Hong Kong, Taiwan, Germany, France and the United States; [and]

(4) Johnson's competitive strength in the market place measured by Johnson's market share of 100 and 200 series motors.

(Dubin Rept. at 34, Ex. 37.)

Dubin observes that in foreign markets, pricing is affected by exchange rates. The extent to which the relative price of goods destined for foreign and domestic markets is affected by movements in the exchange rate is called the "pass-through effect." (*Id.* at 32.) The "pass-through" principle postulates that if the value of a manufacturer's domestic currency appreciates, the manufacturer will pass through the appreciation in value by raising the price for foreign customers. However, scholars have observed that the "pass-through effect" is often inelastic, and foreign manufacturers will not raise their products'

price in the United States to the full extent suggested by changes in the exchange rate alone. (*Id.*)

In comparing Mabuchi's pricing in Japan with its worldwide prices for 100 series micro-motors, Dubin observes that, after 1985, prices were lower in foreign markets than they were in Japan. (*Id.* at 33, Ex. 33.) Until mid–1985, Mabuchi set its prices for 200 series micro-motors in foreign markets at a higher level than they did domestically. (*Id.* at 33, Ex. 34.) Subsequent to mid–1985, Mabuchi's prices for the series 100 and 200 micro-motors sold in foreign markets declined substantially compared to prices in Japan. (*Id.* at 33.)

Using regression analysis, Dubin found that as the Japanese yen appreciated relative to other currencies, Mabuchi increased its foreign price, but not to the full extent reflective of the change in the exchange rates. (*Id.* at 35.) Dubin concludes that Mabuchi did not increase its foreign price to the extent of the change in exchange rates because it was trying to maintain its market share in the face of competition from Johnson. According to Dubin's data, over a five-year period Johnson captured a twenty percent market share for 100 series motors. In less than five years, Johnson captured about a ten percent market share for 200 series motors. (*Id.* at 34.)

Dubin observes that "once Johnson began selling substantial quantities of 100 and 200 series micro-motors, the competitive effect of Johnson's entry forced Mabuchi to lower its price in foreign markets." (*Id.* at 35.) Dubin calculates that on average, Mabuchi suffered a 6.5% decline in prices due to Johnson's entry in the market for 100 and 200 series micro-motors. (*Id.*) Dubin's opinion is that, based upon the pass-through effect and Mabuchi's monopoly position, if Johnson had not entered the micro-motor market, Mabuchi would have raised its prices in foreign markets. (*Id.* at 35–36.)

In calculating the damages that Mabuchi suffered as a result of Johnson's allegedly illegal entry into the 100 and 200 series micro-motor market, Dubin found that Mabuchi suffered three types of damages: (1) price erosion; (2) lost profits; and (3) market erosion.

In terms of price erosion, Dubin found that Mabuchi did not suffer any price erosion in Japan. Of all micro-motors sold outside Japan by all manufacturers, approximately 62% were used in automobiles and 38% were used in small household appliances. (*Id.* at 37.) Only 8% of the automobile micro-motors were sold directly into the United States, whereas 92% of the micro-motors were sold and incorporated into automobiles manufactured outside of the United States. (*Id.*) About 14% of the automobiles using micro-motors manufactured outside of the United States were ultimately sold in the United States. (*Id.* at 38.) As for the micro-motors used in household appliances, 15% were sold directly into the United States, and 85% were initially sold outside of the United States. (*Id.*) Of the household appliances containing micro-motors made outside of the United States, 26% were ultimately imported into the United States. Dubin estimated these figures on the basis of export information provided by foreign governments and trade publications. (Dubin Dep. of 9/11/98 at 171–72.) Dubin assumed that all direct sales of micro-motors into the United States, which were incorporated into automobiles and household appliances made in the United States, were sales which caused Mabuchi to suffer recoverable price erosion. Dubin recognizes that there is a legal question as to whether Mabuchi can recover from Johnson for the infringing use in this country by those employing products made abroad with Johnson's micro-motors. (*Id.*)

In terms of lost-profit damages, Dubin assumed that all Johnson micro-motors were destined for small household appliances because he was informed that Johnson did not sell any 200 series micro-motors that were used in automobiles.

(*Id.* at 39.) Of Johnson's micro-motors destined for small household appliances, only 0.1% of the sales were made directly into the United States. (*Id.*) Dubin assumes that all of the remaining 99.9% of Johnson's micro-motors that were incorporated into household appliances were eventually imported into the United States, (*Id.* at 39–40), despite his previously noted estimate that only 26% of the foreign-made appliances containing micro-motors found their way into this country.

Dubin presented two alternate assumptions in determining market erosion damages. The first assumption is that Mabuchi would have made 100% of Johnson's sales up until March 1989 and that Johnson would not have begun to develop its market share until that date. (*Id.*) Based upon this assumption, he estimates it would have been five years after 1989 before Johnson developed its market share in 100 series micro-motors and four years after 1989 before Johnson would have developed its market share in the 200 series micro-motors. (*Id.*) Dubin further assumed that Mabuchi would have made 100% of the sales that Johnson could not while building its market share. (*Id.*)

In the alternative, Dubin assumed that Mabuchi could not recover market share damages suffered as a result of Johnson's infringement prior to July 1988. (*Id.*) Thus, during three years (1985–88) of selling the micro-motors, Johnson would be able to acquire 60% of its ultimate market share for the 100 series micro-motors and 75% of its ultimate market share for 200 series motors. (*Id.* at 41.) Then from July 1988, when Mabuchi complied with the patent marking statute, until March 1989, when Johnson produced a non-infringing substitute, Mabuchi would have made 100% of Johnson's sales. (*Id.*) Following this period, it would take two years for Johnson to build its ultimate market share in series 100 motors and one more year to reach its ultimate market share in series 200 motors. During these periods,

Mabuchi would have made 100% of those sales that Johnson could not. (*Id.*)

Based upon these assumptions concerning price erosion, lost profits and market erosion, Dubin presented twenty damage scenarios. However, we need not present all of Dubin's scenarios because he opines that Scenario 2A best represents the facts in this case. (*Id.* at 45.) Scenario 2A assumes that Mabuchi suffered a 15% price erosion. (*Id.* at 42, Ex. 45.) Dubin believes that this is the best representation of this case because "there is no doubt in [his] mind that in the 'but-for' world, Mabuchi could have and would have raised prices above historical levels." (*Id.* at 46.) Thus, although the data indicates that Mabuchi lowered its prices by only 6.5% because of Johnson's competition, Dubin opines, on the basis of the testimony of a Mabuchi executive, that, without Johnson's illegal entry into the market, Mabuchi would not have cut its prices, but raised them an additional 8.5%. (*Id.*) Dubin also assumes that Mabuchi is entitled to compensation for both direct and indirect damages. (*Id.* at 45.) In other words, he assumes that Mabuchi is entitled to compensation for the sale of infringing micro-motors outside of the United States, which were later incorporated into products that were imported into the United States. In Scenario 2A, Dubin calculates damages from July 1988, with price erosion commencing in July 1985. (*Id.*)

Using Scenario 2A, Dubin calculated that Mabuchi would have sold 2.9 million fewer 100 series micro-motors due to the increased prices it could have charged for micro-motors had Johnson not entered the market. (*Id.* at 47.) But Mabuchi would have earned about $3.8 million more from higher prices of the micro-motors that it would have sold. (*Id.*) It also would have saved $0.7 million in incremental production costs because it would have produced fewer micro-motors. (*Id.*) Thus, Dubin set price erosion damages at $4.5 million. (*Id.*) As for market erosion, Dubin states that Mabuchi would have sold at least 4.5

million more 100 series micro-motors and 1.2 million more 200 series micro-motors that were sold by Johnson instead. (*Id.*) These additional sales would have resulted in $0.7 million in additional profit. (*Id.*) Thus under Scenario 2A, Dubin concludes that Mabuchi suffered a total of $5.2 million in damages, or $6,603,780 with prejudgment interest.

Although we refrain from discussing each of Dubin's damages scenarios in detail, we note that despite making varying assumptions as to when Mabuchi began accruing damages, in the overwhelming majority of his scenarios, Dubin assumes that price erosion began prior to July 15, 1988. In Scenarios 1A, 1B, 1C and 1D, Dubin assumes that price erosion commenced in November 1987. (*Id.* at 42.) In Scenarios 2A, 2B, 2C, 2D, 3A, 3B, 3C and 3D, Dubin assumes that price erosion commenced in July 1985. (*Id.* at 42–43.) In Scenarios 4A, 4B, 4C and 4D, Dubin assumes that price erosion for 100 series motors commenced in November 1987, and price erosion for 200 series motors commenced in July 1985. (*Id.* at 43.) Only in Scenarios 5A, 5B, 5C and 5D, does Dubin assume that price erosion began in July 1988. (*Id.* at 43–44.)

Under all scenarios, Dubin assumes that "Mabuchi would have been able to effectuate a price increase in the assumed amount in all periods in which Johnson did not have the ability to sell non-infringing products and in all periods in which Johnson's market share had not reached its ultimate strength." (*Id.* at 44.)

## DISCUSSION

### I. *Legal Standard for Admission of Expert Testimony*

There are two federal rules of evidence governing testimony by expert witnesses. Rule 702 provides that:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qual-

ified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

Rule 703 governs the foundation for the opinions of expert testimony. It provides that:

[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed.R.Evid. 703.

■ Pursuant to these rules, "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir.1999) (evidentiary rulings are reviewed for abuse of discretion); *see also Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (evidentiary rulings will not be overturned unless manifestly erroneous).

■ In order to determine the admissibility of expert witness testimony, the Supreme Court has set forth a two-prong inquiry into the reliability and relevance of the evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). First, the trial judge must determine whether the expert is proposing to testify to scientific knowledge. *Id.* at 592, 113 S.Ct. 2786. "The adjective 'scientific' implies a grounding in the methods and procedures of science" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590, 113 S.Ct. 2786. Second, the court must determine whether

the testimony "will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. In other words, the proper analysis is one that ensures that the proffered expert testimony "is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court expanded *Daubert*'s holding to all expert testimony, rather than just the scientific testimony challenged in the *Daubert* case. *Kumho*, 526 U.S. at 147–49, 119 S.Ct. 1167. The Court re-emphasized the relevance and reliability requirements in determining the admissibility of expert testimony: Rule 702 "establishes a standard of evidentiary reliability ... requir[ing] a valid connection to the pertinent inquiry as a precondition to admissibility ... [and] a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 1175 (internal quotations and citations omitted). In sum, the objective of *Daubert* "is to ensure the reliability and relevancy of expert testimony." *Kumho*, 526 U.S. at 149, 119 S.Ct. 1167.

Nevertheless, the Second Circuit has adopted a rather broad standard for the admissibility of expert witness testimony. In *Boucher,* the Second Circuit stated that:

> although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.

*Boucher*, 73 F.3d at 21 (internal quotations and citations omitted).

However, where a purported expert fails to meet the requirements of the Federal Rules of Evidence and *Daubert,* courts within the Second Circuit have not hesitated to exclude the expert's testimony at trial. *See, e.g., Cayuga Indian Nation of New York v. Pataki,* 83 F.Supp.2d 318 (N.D.N.Y.2000) (excluding expert valuation testimony as neither reliable nor relevant); *Donnelly v. Ford Motor Co.,* 80 F.Supp.2d 45, 1999 U.S. Dist. LEXIS 20255 (E.D.N.Y. Dec. 30, 1999) (granting defendants' motion for summary judgment based upon exclusion of plaintiff's expert on causation); *Mink Mart, Inc. v. Reliance Ins. Co.,* 65 F.Supp.2d 176, 181 (S.D.N.Y.1999) (granting third-party defendants' motion for summary judgment based upon exclusion of plaintiff's expert on causation).

Finally, the court must take into consideration the expert's background and practical experience when deciding whether an expert is qualified to render opinion testimony. *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995). However, because Johnson has not challenged Dubin's qualifications as an expert, and it is clear that Dubin has an extensive background in econometrics, this Court will consider only whether the proffered expert testimony meets the relevance and reliability tests set forth in *Daubert.*

Federal Rule of Evidence 104(a) provides that the proponent must establish by a preponderance of proof the admissibility of the expert's testimony. *See Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786; *Golod v. Hoffman La Roche,* 964 F.Supp. 841, 860 (S.D.N.Y.1997). Although the proponent has the burden of establishing admissibility, the Second Circuit has noted that *"Daubert* reinforces the idea that there should be a presumption of admissibility of evidence" and the Circuit has interpreted *Daubert* as having "advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable." *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995), *cert. denied,* 517 U.S. 1229, 116 S.Ct. 1869, 134 L.Ed.2d 966 (1996).

## II. *Relevance*

In order to determine whether the expert's testimony will assist the trier of fact

in understanding or determining a fact in issue, the testimony must not only be reliable, but must be relevant in that it "fits" the facts of the case. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786. Johnson argues that Dubin's analysis does not "fit" the facts of this case because it fails to take into account the following "outcome determinative facts ...: (1) Mabuchi is not entitled to any damages based upon Johnson's alleged patent infringement prior to July 15, 1988, pursuant to 35 U.S.C. § 287; (2) Johnson never manufactured, sold or used any allegedly infringing products in the United States after July 15, 1988; and (3) Mabuchi admits that Johnson ceased manufacturing in Hong Kong the allegedly infringing mini-motors in early 1989 and began manufacturing its alternative non-infringing mini-motors." (Pls.Mem. at 7.)

### A. Damages for Infringement Prior to July 15, 1988

As mentioned above, Judge Sprizzo granted Johnson's cross-motion for partial summary judgment barring any claims by Mabuchi for damages for alleged patent infringement occurring prior to July 15, 1988, the date Johnson first received actual notice of infringement from Mabuchi. (Order of Sprizzo, J., July 7, 1994.) Judge Sprizzo relied on the Federal Circuit's decision in *Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178 (Fed.Cir. 1994), in ruling that Mabuchi could not collect damages for patent infringement that occurred prior to their compliance with the patent marking statute. In response, Mabuchi submits that either (i) the *Amsted* decision should not preclude damages accruing after an infringer actually learns of the existence of the patent that he is infringing; or (ii) the *Amsted* case was wrongly decided by the Federal Circuit.

■ However, this Court is constrained by the "law of the case" and will not reconsider the issue of whether Mabuchi can obtain damages for alleged patent infringement prior to July 15, 1988. As most commonly defined, the doctrine of the "law of the case" mandates that when a court makes a ruling of law, that decision should continue to govern the same issues in subsequent stages in the same case, unless that decision is clearly erroneous and would work a manifest injustice. *See Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).

Here, Judge Sprizzo decided that Mabuchi's damages would be limited to those suffered after compliance with the patent marking statute on July 15, 1988. Although Judge Sprizzo certified the order granting Johnson's motion for immediate appeal pursuant to 28 U.S.C. § 1292(b), the Federal Circuit denied permission for leave to appeal. *See Johnson Elec.,* 1997 WL 173208, 1997 U.S.App. LEXIS 7687, at *1–2. This Court cannot and will not overturn or ignore Judge Sprizzo's decision.

■ Even if not constrained by Judge Sprizzo's order, we would hold that Mabuchi is not entitled to damages accruing prior to its compliance with 35 U.S.C. § 287, the patent marking statute. This section of the patent law states in relevant part:

> [i]n the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continue to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

35 U.S.C. § 287.

Thus, as previously ordered in this case, Mabuchi may not seek damages for any acts of infringement committed prior to July 15, 1988 and to the extent that Dr. Dubin has based his damage computations on Johnson's activities before that date, his conclusions are fatally flawed.

Although Dubin presents several scenarios in which he calculates damages from July 1988 forward, with the exception of Scenarios 5A–5D, his computations of price erosion commence in June 1985. In

Scenario 2A, Dubin commences price erosion for both the 100 and 200 series micromotors in July 1985, when Johnson entered the market. Price erosion accounts for more than three million dollars, or more than half, of the total damages found in Scenario 2A. Thus, Dubin's erroneous reliance on Johnson's entry into the market, instead of Mabuchi's compliance with the marking statute, as the starting date for price erosion significantly alters Dubin's measure of damages. Price erosion is merely one measure of damages and thus, to the extent that it occurred prior to compliance with the patent marking statute, cannot be considered.

In sum, Mabuchi cannot recover *any* damages, including those for price erosion, for the acts committed prior to July 15, 1988, when Mabuchi gave Johnson notice of infringement. That Dubin's damages calculus is heavily weighted by the factor of estimated price erosion during earlier periods alone destroys the validity of his conclusions. The effect on the price of micro-motors of Johnson's presence in the market from 1985 through 1988 is simply irrelevant to the measure of damages in this case.

### B. *Indirect Damages*

■ Johnson also challenges Dubin's assertion that Mabuchi is entitled to damages for use infringement by Johnson's customers, where Johnson's customers used the allegedly infringing micro-motor in the United States after July 15, 1988, but the micro-motor was made and sold by Johnson prior to that date. In fact, Dubin's report relies heavily on these indirect damages because Johnson sold only 9,600 allegedly infringing motors, with a total value of $6,624, in the United States and all of these were sold prior to July 15, 1988, the earliest date for which infringement damages can be assessed against Johnson. (Dubin Dep. of 6/8/99 at 345–46.)

Johnson argues that the patent law, specifically 35 U.S.C. § 271, does not permit recovery of damages based upon "indirect" sales resulting in use in the United States, and therefore Dubin's analysis is not relevant. In response, Mabuchi argues that Dubin's report is relevant because Johnson has assumed liability for the use infringement of all those using Johnson micromotors in the United States. (Defs.Mem. at 8–9, 16.) Thus, Mabuchi contends, to the extent that these indirect customers could have been held liable for use infringement, Johnson would be liable for those damages.

For the purposes of the present discussion, we will assume that if Johnson's customers used the allegedly infringing micromotors in the United States after July 15, 1998, those customers would themselves be subject to liability under 35 U.S.C. § 271.[2] However, Johnson's potential liability for this use infringement raises several issues that we decline to decide before trial in this case because it is unnecessary for the resolution of the instant motion. First, a question of fact remains as to whether Johnson assumed liability for its customers' use infringement in the 1987 Settlement Agreement.

Nevertheless, for present purposes we will further assume that Johnson could be held liable for inducing patent infringement by the ultimate users. 35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer". In *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1141 (7th Cir.1975), Honeywell alleged that Metz made and sold the accused devices, but these acts occurred in Europe rather than in this country. The court found that "although the patent laws of the United States do not have extra-territorial effect, 'active inducement' may be found in events outside the United States if they result in a direct infringement here." *Id.; see also*

---

**2.** Section 217 provides: "whoever without authority makes, *uses* or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271 (emphasis added). '

282

*Engineered Sports Prods. v. Brunswick Corp.,* 362 F.Supp. 722, 727 (D.Utah 1973) (upholding jurisdiction over foreign corporation where the defendants sold the ski boots in foreign countries with knowledge that the boots would be distributed domestically).

By its terms, section 271(b) requires that liability be found only if the inducement is "active." Thus in order to hold Johnson as a contributory infringer, Mabuchi must show that Johnson "purposefully caused, urged or encouraged" its customers to infringe. *Fromberg, Inc. v. Thornhill,* 315 F.2d 407, 411 (5th Cir.1963); *Marston v. Gant,* 351 F.Supp. 1122, 1125 (E.D.Va.1972). If Johnson knew that its motors would be used in the United States their sale might constitute causing or encouraging infringement, although we find it unnecessary to resolve that question at this time.

Even if Johnson is liable for indirect damages that Mabuchi suffered through the use infringement of Johnson's customers (either because Johnson assumed liability in the settlement agreement or induced infringement), Dubin's report errs in all scenarios which assume that Mabuchi is entitled to damages for use infringement by third parties during the period from July 1985 through June 1988. Although Judge Sprizzo's July 7, 1994 Order limits only *direct* damages to the period after Johnson's receipt of actual notice of infringement, the patent law is clear in stating that *no damages* may be recovered by the patentee until notice is provided to the infringer. *See* 35 U.S.C. § 287. Therefore, to the extent that the indirect damages that Mabuchi seeks arise from Johnson's sales prior to July 1988, Dubin's calculations of those indirect damages are erroneous.

### C. *Micro-motor Use in Automobiles*

█ Further undermining the validity of Dubin's opinion is his reliance on the use of micro-motors in automobiles. Although Dubin admits and accounts in his lost profits calculations for the fact that none of Johnson's allegedly infringing micro-motors were sold to automobile manufacturers, (Dubin Rept. at 39), a large portion of Dubin's report discusses damages arising from the use of micro-motors in automobiles. Mabuchi argues that although none of Johnson's micro-motors were used in automobiles, they *could have been,* and this potential competition forced Mabuchi to lower the price of its micro-motors sold to automobile manufacturers. However, Mabuchi's argument fails because the United States patent law awards damages only when the infringing products are made, sold or used in the United States. Because Johnson's micro-motors were made and directly sold only outside the United States and were never used in automobiles either in or out of the United States, awarding damages to Mabuchi for price erosion in the worldwide automobile market due to potential competition from Johnson would punish Johnson for acts which are clearly beyond the reach of the United States patent laws.

Yet Dubin uses data from the automotive industry to estimate the demand curve for 200 series micro-motors, uses this curve in his econometric analysis, and bases his conclusions about price and market erosion upon this analysis. As discussed above, price erosion accounts for the major portion of Dubin's computed damages. Although Dubin assumed that all the Johnson micro-motors were destined for small household appliances when calculating lost profits, his inexplicable reliance on automotive data introduced an error with unknown but probably significant impact on his conclusions.

### III. *Reliability*

This Court's reliability assessment must focus on whether the reasoning or methodology underlying the testimony is scientifically valid. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. In *Daubert,* the Supreme Court set forth four non-exclusive factors to aid in the reliability assessment:

(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Id.* at 593–94, 113 S.Ct. 2786.

However, the reliability inquiry is a "flexible" one, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *See Kumho,* 526 U.S. at 150–51, 119 S.Ct. 1167. Thus, this Court's role is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167.

### A. *Methodology*

■ Insofar as concerns Dubin's use of regression analysis, his methodology is well-established as reliable. Numerous courts have held that regression analysis is a reliable method for determining damages and "a mainstream tool in economic study." *In re Industrial Silicon Antitrust Litig.,* No. 95–2104, 1998 WL 1031507, at *2 (W.D.Pa. Oct.13, 1998); *see also City of Tuscaloosa v. Harcros Chemicals,* 158 F.3d 548, 565 (11th Cir.1998) (noting that multiple regression analysis is a methodology that is well-established as reliable); *In re Polypropylene Carpet Antitrust Litig.,* 2000 WL 463169, at *8 ("[e]conomists frequently look to regression models to explain changes in prices").

### B. *Lack of Empirical Data*

■ However, even where an expert's methodology is reliable, if the analysis is not based upon relevant and reliable data, the expert's opinion will be inadmissible. *See General Elec. Co. v. Joiner,* 522 U.S.

136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Johnson argues that Dubin's opinion is unreliable because Dubin fails to rely on empirical data to determine the number of indirect sales of micro-motors into the United States. Admittedly, Dubin has no empirical data as to the number of Johnson's micro-motors incorporated into products that were shipped into the United States, and, as noted above, his computations as to that number are based on highly questionable assumptions.

■ Under *Daubert* and the Federal Rules of Evidence, experts are not required to base their opinions on empirical data alone. However, the expert must have some reliable basis for extrapolating from the available data. The Supreme Court has stated:

[t]rained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec.,* 522 U.S. at 146, 118 S.Ct. 512.

■ Johnson argues that there is no evidence that Johnson's customers made any sales in the United States. (Pls. Reply Mem. at 8.) Despite the fact that Johnson provided Dubin with the actual invoices of all its micro-motor transactions, (Dubin Rept. at 18), which would have enabled the pursuit of evidence as to the number of Johnson micro-motors which were incorporated in products imported to and used in the United States, Dubin's report admittedly bases his damage calculations on mere estimates of such importation and use.

Dubin relied on Ward's Automotive Yearbooks in order to determine how many two-door and four-door cars were manufactured worldwide from 1982–1992,

and thus to estimate how many power door locks and mirrors were installed in cars during that time period. (*Id.* at 23.) He apparently assumed that 200 series micromotors were used in all of them. (*Id.*)

As already mentioned, this exercise is wholly irrelevant because Johnson's micromotors were never used in automobiles. And everything that Johnson did during the damage period was done outside the United States, so that any effect that those activities might have had on the market for micro-motors used in automobiles is not cognizable under United States law.

Dubin used information provided from the Toy Manufacturers of America and *Appliance Magazine* in order to "estimate[ ] the number of hair dryers, electric toothbrushes, juicers, and electric trains/cars shipped into the United States." (*Id.* at 25.) Dubin also collected information on "the percentage of small household appliance units imported into the United States from specific countries and the percentage of total small household appliance production, by specific country, that was exported to the United States." (*Id.* at 25.) In order to determine what percentage of Hong Kong exports containing 100 series micro-motors are sold in the United States, Dubin assumed that all $^{110}\!/_{120}$ volt products marked with the Underwriters Laboratory stamp were exported to the United States. However, a product's certification for export to the United States does not make export to the United States a certainty. Many of those products may have been shipped to other counties where the UL stamp, if noticed at all, could be recognized as merely a certificate of quality, like a Good Housekeeping seal of approval. Moreover, Dubin's estimation of the number of small household appliances shipped into the United States does not provide the Court with any reliable information concerning how many contained Johnson micro-motors. Dubin's conclusions are suspect for these additional reasons.

### C. *Dubin's Assumptions as to Market Erosion*

Dubin's report makes several unsupported assumptions as to market erosion. First, Dubin assumed that Johnson would not have made sales in the micromotor market until March 1989, when it developed a non-infringing alternative. (Dubin Rept. at 40.) However, Johnson has been manufacturing and selling motors since the early 1960's. (Defs.Mem. at 3.) Hair dryers, automatic door locks, and electric toothbrushes were all in wide use before Mabuchi developed the micro-motor of the '215 patent and micro-motors were used in all of them. Although the two-piece brushgear taught by the '215 patent apparently improved micro-motor technology, certainly other non-infringing micro-motors were available for purchase by the customers of Johnson and Mabuchi both before and after that invention. Thus it is unrealistic to assume that, without copying Mabuchi's micro-motor, Johnson could not have competed at all for the business of small household appliance manufacturers.

It is an even farther stretch to assume that every sale Mabuchi made would have been made by Mabuchi. The record does not even show whether Mabuchi sold micro-motors in every country that Johnson did. For these further reasons, Dubin's conclusions are unreliable.

### D. *Market Reconstruction*

Mabuchi argues that Dubin's report analyzes damages that *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir.1978), and *Grain Processing Corp. v. American–Maize Prods. Co.*, 185 F.3d 1341 (Fed.Cir.1999), direct the Court to consider. In determining the amount of damages in a patent infringement case, the fact-finder must consider "had the Infringer not infringed what would Patent Holder ... have made." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (internal quotations omitted).

In *Panduit*, the Sixth Circuit, in an opinion by former Federal Circuit Chief Judge Markey, sitting by designation, identified four tests for determining whether a lost-profits analysis is proper: (1) whether demand existed for the patented product; (2) whether acceptable non-infringing substitute products were available to satisfy the demand; (3) whether the patent owner possessed the manufacturing and marketing capability to meet the demand; and (4) whether lost profits can be reasonably calculated. *See Panduit*, 575 F.2d at 1156. In this case Mabuchi has not even attempted to satisfy the second and third of these tests. Most importantly, · Dubin did not discuss, and apparently never considered, the commercial acceptability of non-infringing substitutes.

Further, Mabuchi points to *Grain Processing* as support for Dubin's reconstruction of the micro-motor market in order to prove damages. The *Grain Processing* court stated:

> ... The "but for" inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee "would ... have made." *See Grain Processing Corp. v. American Maize Prods. Co.*, 979 F.Supp. 1233, 1236 (N.D.Ind.1997) ("Grain Processing VIII"). Reconstructing the market, by definition a hypothetical enterprise, requires the patentee to project economic results that did not occur. To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture. *See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029–30, 39 USPQ2d 1304, 1307 (Fed.Cir.1996); *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 673, 7 USPQ2d 1097, 1107–08 (Fed.Cir. 1988). Within this framework, trial courts, with this court's approval, consistently permit patentees to present mar-

ket reconstruction theories showing all of the ways in which they would have been better off in the "but for world," and accordingly to recover lost profits in a wide variety of forms. *See, e.g., King Instruments [Corp. v. Perego ]*, 65 F.3d [941,] at 953 (upholding award for lost sales of patentee's unpatented goods that compete with the infringing goods); *Rite–Hite [Corp. v. Kelley Co. Inc.]*, 56 F.3d [1538,] at 1550 (holding that a patentee may recover lost profits on components that have a functional relationship with the patented invention); *Brooktree Corp.[ v. Advanced Micro Devices, Inc.]*, 977 F.2d [1555,] at 1580 (upholding award for price erosion due to infringer's marketing activities); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1579, 24 USPQ2d 1321, 1337 (Fed.Cir. 1992) (upholding award for price erosion due to infringing sales); · *State Indus., [Inc. v. Mor–Flo Indus., Inc.]*, 883 F.2d [1573,] at 1580 (upholding award of lost profits in proportion to patentee's market share of the relevant market including acceptable noninfringing substitutes); *Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 22, 223 USPQ 591, 599 (Fed.Cir.1984) (upholding award compensating the patentee for its decreasing marginal cost of producing the good, i.e., its increasing marginal profit, as its volume of production would have increased); *Lam, [Inc. v. Johns–Manville Corp.]*, 718 F.2d [1056,] at 1065 (upholding lost profits award for future lost sales, and for the patentee's increased promotional expenses); *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 687 F.Supp. 134, 137–38, 9 USPQ2d 1152, 1154 (S.D.N.Y. 1988), *rev'd in part on other grounds*, 1 F.3d 1214, 27 USPQ2d 1671 (Fed.Cir. 1993) (permitting recovery for future depressed prices, i.e., "projected price erosion", and for accelerated market reentry by the infringer). In sum, courts have given patentees significant latitude to prove and recover lost profits for a

wide variety of foreseeable economic effects of the infringement.

*Grain Processing,* 185 F.3d at 1350.

Johnson argues that Mabuchi's reliance on *Panduit* and *Grain Processing* is misplaced because these cases require that Mabuchi's damages analysis be based upon actual sales in the United States by Johnson's customers. Johnson points out that in *Panduit,* the economic analysis was based upon the infringer's actual sales and not upon hypothetical sales of products containing the infringing device. Further, Johnson argues that the *Grain Processing* Court recognized that speculative economic analysis must be rejected. *Grain Processing,* 185 F.3d at 1350 ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture").

■ This Court agrees that speculative economic analysis must be rejected. It can be appropriate to utilize market reconstruction to prove damages, particularly in patent cases. However, if Mabuchi wishes to reconstruct the micro-motor market, that reconstruction must be grounded on the most relevant and reliable data available.

Although Mabuchi argues that Johnson and its customers resisted discovery, it is not clear why the data that Johnson and Mabuchi provided Dubin were insufficient to permit an estimation of damages. Mabuchi fails to point to any specific transactions in which Johnson sold micro-motors to customers outside of the United States which were later incorporated into products imported into the United States. Johnson provided Mabuchi with invoices for all of its customers who purchased allegedly infringing motors. (Weiss Reply Aff. ¶ 7.) Mabuchi obtained letters rogatory in order to take the deposition of D. Rögelein GmbH, Johnson's customer in Germany, but never filed or served the letters rogatory. (*Id.* at ¶ 9.)

Instead of pursuing formal discovery with Johnson's customers, Mabuchi sent letters to the customers requesting voluntary disclosure. (*Id.* at ¶ 11, Ex. C.) At least one customer provided Mabuchi with copies of the documents requested. (*Id.* at ¶¶ 13–14, Exs. D, E.) Although we are cognizant of the difficulties inherent in obtaining discovery from foreign corporations, direct evidence of how the micro-motors were used by even a few of Johnson's customers would have been helpful to the trier of fact in determining the damages Mabuchi suffered.

### IV. *Summary*

In assessing the reliability of an expert opinion, a resort to common sense is not inappropriate. Dr. Dubin's opinion, despite its dazzling sheen of erudition and meticulous methodology, reaches a result which any average person could readily recognize as preposterous.

Consider these figures: The period for which Mabuchi can collect damages extended only nine months, from July 15, 1988 to March 1989. During those three quarters, Johnson's worldwide sales of both series 100 and series 200 micro-motors totaled less than 2 million units. (Dubin Rept., Ex. 12.) Dr. Dubin stated that 14% of the motors sold outside the United States were incorporated in products that were imported into the United States. (*Id.* at 37.) If that is correct, less than 280,000 of these Johnson micro-motors were used in the United States. On the sale of these micro-motors, Johnson grossed less than $200,000. Even assuming that, but for Johnson's infringement, Mabuchi would have sold every one of these motors, and further assuming, as Dr. Dubin did, that Mabuchi could have sold them at prices 15% higher than the competitive market prices, it would have made less than $230,000 in additional sales. There is no evidence as to the profit Mabuchi would have made on those sales, but it seems safe to assume that its profit would have been substantially less than $100,000.

It is hard to perceive how Johnson's sales during the damage period injured Mabuchi in an amount greater than the sum of those potential lost profits.

Yet, after a dauntingly complex process involving the seemingly unnecessary construction of obviously unrealistic market models incorporating many irrelevant factors, Dr. Dubin arrives at the startling conclusion that Johnson's infringement entitles Mabuchi to $5.2 million in damages plus $1.4 million in pre-judgment interest for a total of $6.6 million. Thus, for every dollar of profit that Mabuchi arguably lost because of Johnson's legally cognizable infringement, Dr. Dubin would award Mabuchi damages of over $50 plus interest. This would make Mabuchi not merely "whole," but at least $5 million dollars richer than it would have been if Johnson had neither made nor sold any infringing micro-motors during the damage period.

The Court has not the slightest difficulty in concluding that Dr. Dubin's opinion fails to satisfy Rule 702's requirement that it assist the trier of fact in understanding the evidence or determining factual issues in the case.

## CONCLUSION

For the reasons stated above, Johnson's motion *in limine* to exclude the testimony of Dr. Dubin is granted.

SO ORDERED.